IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| NORA F. LAGRONE O'CONNOR, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>COMMISSIONER OF SOCIAL SECURITY )<br>)<br>Defendant. )<br>) | Civil Action No. 3:09-1887-JFA-JRM<br><br><br><br>**REPORT AND RECOMMENDATION** |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Disability Insurance Benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

Plaintiff applied for DIB on August 25, 2005, alleging disability since March 8, 2005 due to cognitive impairment, transient ischemic attacks (TIAs), memory loss, stroke, a brain lesion and encephalopathy. (Tr. 125-127, 147). Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). After a hearing held July 22, 2008, at which Plaintiff appeared and testified, the ALJ issued a decision dated August 20, 2008, denying benefits and finding that Plaintiff was not disabled. The ALJ, after hearing the testimony of a vocational expert ("VE"), concluded that work exists in the national economy which Plaintiff could perform.

Plaintiff was forty-five years old at the time of the ALJ's decision. She has a high school education plus one year of college and has past relevant work as an administrative specialist, administrative assistant, data entry operator, and clerk typist. (Tr. 215-216).

The ALJ found (Tr. 20-34):

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since March 8, 2005, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. The claimant has the following severe impairments: mood/somatoform disorder and status-post transient ischemic attacks (microvascular disease) (20 CFR 404.l520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: no climbing, no exposure to hazards, simple repetitive and routine tasks, low stress setting with occasional decision-making and changes in work setting, no more than occasional exposure to the general public, and occasional interaction with co-workers/supervisors.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on September 24, 1962 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

2

> transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
>
> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from March 8, 2005 through the date of this decision (20 CFR 404.1520(g)).

The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (Tr. 1-4). Plaintiff then filed this action in the United States District Court on July 16, 2009.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## MEDICAL RECORD

Dr. John H. Lucas, IV, a neurologist, examined Plaintiff on March 16, 2005. Plaintiff complained of numbness and achiness in her arms, achiness in her legs, slurred speech, poor balance, and difficulty with driving. She felt there was "something mushy inside her brain" and heard a

"click" inside her head during an MRI. Dr. Lucas noted he had seen Plaintiff in 1999 for an "unrevealing work up after an episode of confusion," and that an MRI suggested "a few small areas of T2 signal abnormality and a mucus retention cyst." His examination revealed no weakness, no facial asymmetry, normal reflexes in her arms and ankles, brisk knee-jerk reflexes, and normal gait. Dr. Lucas diagnosed Plaintiff with "[s]upposed white matter changes by MRI," cognitive complaints, and diffuse aches and paresthesias. Tr. 226-227. On March 23, 2005, Dr. Lucas noted that Plaintiff's MRI showed "trivial small vessel changes" and that her EEG was normal. Nerve conduction studies were conducted and the results were normal. Tr. 225, 239.

Plaintiff received treatment at Doctor's Care Northwoods in North Charleston, South Carolina since at least March 2004. Tr. 247-303. On March 26, 2005, Plaintiff asked a nurse at Doctor's Care to extend her restriction of no work, and the nurse advised her to ask her neurologist. Tr. 272. On March 30, 2005, Dr. Richard Rhodes (a family practitioner at Doctor's Care) reported that due to TIAs Plaintiff would be unable to perform any work until May 8, 2005. Tr. 271.

Dr. Brian L. West, a psychologist, performed a neuropsychological evaluation of Plaintiff on April 25, 2005. Plaintiff related a history of multiple episodes of slurred speech, vertigo, stuttering, decreased attention and memory, impaired memory, muscle aches, and irritability. Dr. West thought that Plaintiff was "status post cerebrovascular effects suggestive of a history of TIA's over the past six years." Tr. 219. Testing and examination revealed that Plaintiff had a Full Scale IQ of 99, normal sensory function, no learning or memory deficits, adequate reasoning abilities, slow information processing speed, and impaired attention regulation. Dr. West's diagnoses were cognitive mood disorder and rule out somatoform disorder. He recommended psychiatric evaluation and procedures to rule out encephalopathy. Tr. 219-222.

4

Plaintiff returned to Dr. Lucas on May 9, 2005 with complaints of headache, pain in her arms and legs, impaired speech, and confusion. He diagnosed mild microvascular cerebrovascular disease (based on elevated homocysteine and smoking) and somatoform disorder. A sleep study was recommended. Dr. Lucas excused Plaintiff from work for an undetermined period of time, "probably...a couple of weeks," due to the need for additional testing. Tr. 232, 235.

Plaintiff began treatment with Dr. Perry E. Trouche, a psychiatrist, on June 14, 2005. She complained of decreased cognitive functioning, poor balance, loss of memory, headaches, stuttering, and a tendency to drop things. She also reported that her ex-husband had abused her daughter and that legal proceedings regarding visitation were pending. Dr. Trouche prescribed Lexipro and Ativan. About two weeks later, Plaintiff reported that she felt better on Lexapro, but complained of depression, intermittent anxiety, decreased memory, changes in vision, and physical symptoms. Tr. 319-320.

Dr. Trouche completed an Attending Physician's statement on June 28, 2005. He listed Plaintiff's diagnoses as cognitive disorder NOS, anxiety, possible mood disorder, chronic pain, and a history of TIAs. He opined that Plaintiff was unable to work because of her condition. Tr. 444-445.

On July 7, 2005, Plaintiff complained to Dr. Lucas about difficulty with concentration and diffuse aches and pains. Dr. Lucas noted that Dr. Trouche was treating Plaintiff for a mood disorder and had "put her out of work." He wrote that the results of a recent sleep study were "unrevealing" and suspected "somatoform disorder as the predominant cause of her symptoms." Dr. Lucas stated that Plaintiff "absolutely must stop smoking or this will only get worse." Tr. 224. In an Attending

5

Physician's Statement dated July 6, 2005, Dr. West opined that Plaintiff was unable to work due to a cognitive disorder. Tr. 432-433.

On July 15, 2005, Plaintiff was treated at Doctor's Care for complaints of memory loss and a fall. She requested a walker. Dr. Rhodes stated that Plaintiff should not drive and should surrender her driving license due to "cognitive disability." On July 19, 2005, Plaintiff asked if she could get her driver's license back because she needed to drive her children to school. Tr. 258, 262, 267.

On August 5, 2005, Dr. Trouche completed a doctor's report in which he noted that Plaintiff had diagnoses of anxiety disorder, depression, and cognitive disorder. Based on Dr. West's testing, Dr. Trouche thought that Plaintiff had a moderately-severe cognitive impairment and was unable to work. He opined that Plaintiff was moderately impaired in her activities of daily living, markedly impaired in social functioning and concentration, and markedly impaired in adaptation to stressful conditions. Tr. 440-442.

On October 4, 2005, Plaintiff reported decreased depression and anxiety. On examination, Dr. Lucas noted that Plaintiff had a "subtle tremor with the hands outstretched," normal gait, no weakness, and "the slightest of expressive dysfluency." Microvascular disease on the basis of elevated homocysteine and tobacco use was diagnosed, Plaintiff was advised that she must stop smoking, and Depakote was prescribed for headache and mood disorder. Dr. Lucas thought that Plaintiff was "doing much better" with regard to her somatoform disorder. Tr. 243.

A March 14, 2006 head CT was negative. Tr. 384. On March 16, 2006, Dr. Lucas noted that Plaintiff had lost fifteen pounds, complained she had no appetite, and continued to smoke. Dr. Lucas expressed concern over Plaintiff's mild white matter changes, smoking, and progressive weight loss with regard to possible chronic central nervous system infection. He recommended a lumbar

6

puncture to rule out multiple sclerosis and a medical evaluation to rule out a cancerous process. Dr. Lucas wondered how much a role depression played in Plaintiff's symptoms. Tr. 383.

Cashton B. Spivey, a psychologist, evaluated Plaintiff at the request of the Commissioner on March 31, 2006. Plaintiff reported a history of cerebrovascular accidents in 1999 and March 2005, TIAs, and current symptoms of memory deficits, low energy, headaches, and problems with balance, coordination, attention, and concentration. She said she stopped working in March 2005 due to a cerebrovascular accident. Testing revealed that Plaintiff had low-average intellectual functioning, with a Full Scale IQ of 83; satisfactory visual-motor functioning; average reading, spelling, and arithmetic skills; average attention and concentration; mild-to-moderate immediate and short-term verbal memory deficits; mild short-term visual memory loss; and intact immediate visual memory functioning. Dr. Spivey diagnosed Plaintiff with depressive disorder, status post cerebrovascular accident, status post TIAs, and headaches. Tr. 323-327.

Dr. Kerri A. Kolehma, a neurologist, examined Plaintiff at the request of the Commissioner on April 12, 2006. She noted that Plaintiff carried a cane, but had a normal gait, no loss of balance with tandem walking, full strength in all muscle groups, decreased sensation in the right upper and lower extremities, normal speech, normal fine finger movements, no evidence of tremor, hyperreflexic reflexes in the lower extremities, and positive clonus[1] bilaterally. Plaintiff was diagnosed with "[h]yperreflexia with beats of clonus" and questionable memory difficulties. Dr. Kolehma recommended that Plaintiff avoid climbing due to complaints of dizziness. Tr. 330-332.

---

[1] Clonus refers to an "alternate muscular contraction and relaxation in rapid succession." Dorland's Illustrated Medical Dictionary 377 (30th ed. 2003).

Dr. Jeffrey Vidic, a state agency medical psychologist, completed a Psychiatric Review Technique form on April 16, 2006. He noted that Dr. West found that Plaintiff had mild deficits and an IQ in the average range; Plaintiff was not receiving any psychiatric treatment or medication when she saw Dr. Spivey; and Plaintiff reported activities of daily living and frequency of treatments that were inconsistent with her alleged limitations. Dr. Vidic opined that Plaintiff had no limitations in activities of daily living, mild limitations in social functioning, mild limitations in concentration, and no extended episodes of decompensation. He thought that Plaintiff's mild cognitive impairment and depressive disorder were not severe impairments. Tr. 334-347.

Dr. George T. Keller, III, a state agency physician, reviewed Plaintiff's medical records and assessed Plaintiff's physical RFC on April 18, 2006. He found no documentary evidence of significant cerebrovascular accident or peripheral neurologic impairment and noted that Plaintiff's neurological examination was essentially normal except for decreased sensation on the right and hyperreflexia in her lower extremities. Plaintiff's only limitations were that she should not climb ladders, ropes, or scaffolds. Tr. 348-354.

In May 2006, Plaintiff told Dr. Rhodes that her medication was helping with her memory and asked if she could get her driver's license back. Dr. Rhodes noted that Plaintiff's memory seemed improved and found she was able to drive. Tr. 358.

On June 8, 2006, Plaintiff reported three TIA-like episodes, which she described as feeling like "something was going on inside of her brain," and complained of paranoia, difficulty with speech, weakness, inability to concentrate, and a sensation of itching-and-burning all over. Dr. Lucas noted that the results of Plaintiff's lumbar puncture were negative, and his examination revealed normal tone, bulk, strength, reflexes, and gait. He commented that Plaintiff stuttered significantly

8

"and then when she is focused on telling me about her symptoms has no stuttering at all." Dr. Lucas noted that Plaintiff had trivial microvascular changes and thought that the vast majority of her symptoms were psychiatric in origin and perhaps related to issues surrounding her daughter. He again noted she needed to stop smoking. Tr. 375.

On July 7, 2006, Plaintiff's blood work was reported as normal. Dr. Lucas's examination revealed that Plaintiff had "faint brisk reflexes diffusely" and a "pseudospeech disorder." He stated that if she did not stop smoking he did "not feel that we are going to make any headway." Dr. Lucas thought that Plaintiff's "[p]sychiatric illness with history of sexual abuse strongly raises the possibility of conversion somatoform symptomatology." Tr. 372. He completed an Attending Physician's Statement on the same day, in which he opined that Plaintiff could lift a maximum of twenty pounds and could lift ten pounds occasionally; could walk/stand for four hours at a time for a total of eight hours in an eight-hour day; could sit for eight hours at a time; could occasionally bend, stoop, and reach; could frequently grasp; could perform fine manipulations with both hands; and was "cognitively limited." Tr. 385-386. Dr. Rhodes completed an Attending Physician's Statement on July 15, 2006. He opined that Plaintiff was "totally disabled." Tr. 421-422.

Dr. William Crosby, a state agency physician, assessed Plaintiff's physical RFC on July 29, 2006. He noted that Plaintiff had a history of vaguely defined neurologic problems and MRI evidence of microvascular disease, but she had a normal gait and no neurological deficits. Dr. Crosby opined that Plaintiff could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and should avoid "even moderate exposure" to hazards. He reported no other exertional or nonexertional limitations. Tr. 364-371.

Dr. Thomas F. Stout, a neurologist, examined Plaintiff on referral from Dr. Rhodes on October 2, 2006. He found that Plaintiff had normal attention, language, muscle tone, strength, sensation, coordination, gait and station, and was able to give a very good representation of her past medical history. Dr. Stout diagnosed Plaintiff with a mild cognitive impairment, paresthesias, and prior episodes of syncope. He concluded that most of Plaintiff's complaints were psychosomatic in nature and said he had no specific other treatment to suggest. Tr. 423-425.

Dr. West reevaluated Plaintiff at the request of her attorney on October 81, 2006. Dr. West stated that Plaintiff's test results showed average motor functioning and improved motor skills in comparison with her April 2005 examination; some improvement in processing speed; a worsening of attention; no evidence of learning or memory deficits; evidence of "arousal maintenance problems" suggestive of a sleep disorder; evidence of word "disfluency" and dysnomia; and continued mood disorder with anxiety. Plaintiff reported no recent events suggestive of TIAs. Dr. West diagnosed Plaintiff with neurocognitive and mood disorders. Tr. 427-430.

In a physician's report dated December 7, 2006, Dr. Trouche reported that Plaintiff's diagnoses included atypical depression, atypical anxiety, and cognitive disorder, and stated that Plaintiff was "unable to work" due to her condition. He opined that Plaintiff had limitations in social, emotional, and cognitive functioning, but did not indicate their severity. Tr. 435- 437.

On July 30, 2007, Dr. Rhodes wrote that medication helped Plaintiff's mental condition and psychiatric care had not been recommended. He opined that Plaintiff had slowed thought process, appropriate thought content, depressed and anxious mood, poor attention/concentration, poor memory, and "moderate" work-related limitations. Tr. 393.

Dr. Manhal Wieland, a state agency psychologist, completed a Psychiatric Review Technique form on July 31, 2007. He opined that Plaintiff had mild limitations in activities of daily living, moderate limitations in social functioning, moderate limitations in concentration, and no extended episodes of decompensation. In a Mental RFC assessment, he found that Plaintiff had no significant limitations in most areas of functioning and no marked limitations. He opined that she had moderate limitations in the areas of understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule; and asking simple questions or requesting assistance. He opined that Plaintiff could attend to and perform simple tasks; would function better in a slower-paced, lower-stress work environment; could relate appropriately to supervisors and co-workers; might find work with the general public stressful; and might miss an occasional day of work due to her mental condition. Tr. 394-410.

On July 9, 2008, Dr. West diagnosed Plaintiff with a mild cognitive impairment and depression with anxiety. He recommended she return to Dr. Lucas for evaluation and treatment. Tr. 447. Dr. West completed an Examining Psychologist Statement the same day. He opined that Plaintiff's organic mental disorder, affective disorder, and somatoform disorder resulted in moderate restriction of activities of daily living, marked difficulties in social functioning, marked difficulties in concentration, and three extended episodes of decompensation. Dr. West thought that Plaintiff was unable to perform full-time work. Tr. 453-461.

In a Mental RFC Assessment dated July 16, 2008, Dr. West found that Plaintiff had moderate or marked limitations in eighteen out of twenty areas of work-related mental functioning. He stated that Plaintiff had poor attention regulation, which undermined her ability to take in new information,

11

and had significant mood disturbance with anxiety, which resulted in irritability and hostility, especially with the public. Tr. 450-452.

After the ALJ issued his decision, Plaintiff submitted evidence of treatment after the date of the ALJ's decision, as discussed below. On August 25, 2008, Plaintiff complained to Dr. Lucas of continued difficulty with focusing and memory, headaches, and episodes which she felt were TIAs. Dr. Lucas found that Plaintiff had no tremor, slightly brisk lower extremity reflexes, and was "able to speak quite well and then ha[d] episodes of almost a stuttering quality to her speech." He diagnosed minor microvascular changes and suggested a trial of cognitive rehabilitation (as had been recommended by Dr. West) and smoking cessation. On August 29, 2008, an MRI of Plaintiff's brain showed no acute intracranial process and "relatively mild" signal changes in cerebral white matter. Tr. 464-466.

On October 6, 2008, Plaintiff complained of poor concentration and attention, poor focus and energy, and a continuous musical sound in her ears. Dr. Lucas's examination revealed no fluency problems in Plaintiff's speech even though she reported stuttering that day. He noted that she gave poor effort with any type of muscle testing, her minor microvascular changes were stable on all previous images, and her recent CT scan of her head was unrevealing. Tr. 463.

Dr. West evaluated Plaintiff again on November 10, 2008, at the request of her attorney, who provided "a Social Security ruling which apparently denied disabilities claim" and "requested a response to the remarks" in the ruling about previous neuropsychological evaluations. Dr. West stated that he was not Plaintiff's treating physician and that her neurologist, Dr. Lucas, had referred her to him for evaluation. He stated that Plaintiff's sensorimotor function test showed a modest worsening in her dominant hand; her language function tests were consistent with frontal lobe

12

disturbance; attention function tests showed slow processing speeds and attention regulatory problems; learning and memory tests produced results in the average range; and testing for psychopathology showed evidence of dysthymia and social anxiety. Dr. West stated that Plaintiff's functions were in "the lowest 2nd percentile for most processing speed and attention regulatory functions. I find it very difficult to believe that anyone at that level of functioning would be able to handle an ongoing work task without timed computation of tasks becoming extraordinary and not cost effective." He also opined that his findings appeared consistent with those of Drs. Spivey, Stout, and Lucas. Tr. 467-471.

## **HEARING TESTIMONY**

Plaintiff testified that she experienced TIA-like episodes during which she slurred her words, dropped things, felt out of balance and out of focus, and drove off the road. Tr. 40. She said she experienced episodes at work prior to 2005, continued to experience them from 2006 to 2008, and experienced such episodes occasionally at the time of the hearing. Plaintiff first said that episodes lasted from a few minutes to days, but then stated they lasted from a few minutes to two hours. Tr. 42. She said that she had memory problems and the attention span of a four-year old. Tr. 46-47. She did not have difficulty getting along with other people or dealing with stressful situations. Although Plaintiff surrendered her driver's licence in 2005, she got it back and drove to doctors' appointments, the grocery store, and her daughter's activities. Tr. 49-50. Plaintiff was able to mow the lawn, cook simple meals, take her daughter to and from activities, and do housecleaning. Tr. 48-51.

## **DISCUSSION**

Plaintiff alleges that: (1) the Appeals Council committed reversible error by failing to make specific findings of fact concerning the weight it gave to new and material evidence from Dr. West;

13

(2) the ALJ erroneously rejected the opinion of Dr. West; (3) the ALJ erroneously rejected the opinion of treating psychiatrist Dr. Trouche; and (4) the Appeals Council should award benefits rather than remand this action. The Commissioner contends that the ALJ's decision is supported by substantial evidence[2] and free of reversible legal error.

Specifically, the Commissioner argues that the Appeals Council was not required to explain its reasons for finding that the new evidence (in particular Dr. West's November 2008 report) did not provide a basis for changing the ALJ's decision. The Commission contends that the ALJ reasonably gave minimal weight to the opinion of Dr. West because it is questionable whether Dr. West is a treating physician;[3] Dr. West did not examine Plaintiff between November 2006 and July 2008; Dr. West's opinion that Plaintiff was moderately limited in her ability to remember work-like procedures and carry out simple instructions was inconsistent with his findings that Plaintiff was "performing at least average if not above for learning and memory"; there are inconsistencies with Dr. West's opinion that Plaintiff had repeated episodes of decompensation with the lack of evidence of inpatient and psychiatric treatment; Dr. West's opinion is contradicted by the findings of examining physicians

---

[2]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

[3]The ALJ appears to have treated Dr. West's opinion as one of a treating physician. In his November 2008 opinion, Dr. West states that he was not a treating physician or provider. Tr. 468.

14

Spivey, Kolehma, and Stout; Dr. West's opinion is contradicted by the opinions of the state agency psychologist and physician (Drs. Vidic and Wieland); and Dr. West's findings are based heavily on Plaintiff's subjective complaints which were not fully credible. The Commissioner also contends that the decision to discount Dr. West's opinion is supported by Plaintiff's MRIs (which Dr. Lucas thought showed only trivial microvascular changes). Additionally, the Commissioner argues that the ALJ properly gave Dr. Trouche's opinion minimal weight because there were inconsistencies with Dr. Trouche's opinion and treatment records, Dr. Trouche failed to support his opinion with objective findings, he infrequently treated Plaintiff, and the opinion is inconsistent with the findings of the examining and state agency physicians and psychologists.

The Appeals Council must consider evidence submitted with the request for review in deciding whether to grant review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Secretary, Dep't of Health and Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991). Evidence is new if it is not duplicative or cumulative. Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990). Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome. See Borders v. Heckler, 777 F.2d 954, 956 (4th Cir. 1985).

The parties do not appear to dispute that the evidence submitted to the Appeals Council is new or material. This evidence included Dr. West's November 2008 letter which appears to address a number of the reasons why the ALJ discounted his opinion of disability. In particular, Dr. West discusses his findings concerning Plaintiff's attention, which the ALJ specifically discounted. It also discusses the testing performed by Dr. West as compared to that of the examining psychologist Dr. Spivey and the results of Dr. West's multiple neuropsychological tests.

Here, the Appeals Council listed the new evidence (see Tr. 4) and stated "[w]e found that this information does not provide a basis for changing the Administrative Law Judge's decision." Tr. 2. There is a split in authority regarding whether the Appeals Council is required to provide reasons for finding additional evidence would not change the ALJ's decision. Compare Freeman v. Halter, 15 Fed. Appx. 87 (4th Cir. 2001)(unpublished)(concluding that the Appeals Council need not list detailed reasons for its rejection of additional evidence) and Hollar v. Commissioner of the Soc. Sec. Admin., 194 F.3d 1304 (4th Cir.1999)[Table](detailed explanation not required) with Harmon v. Apfel, 103 F.Supp.2d 869 (D.S.C. 2000)(Appeals Council must articulate its reason for rejecting new evidence such that a reviewing court may understand the weight the Commissioner attributed to it) and Wheelock v. Astrue, No. 9:07-3786-HMH-BM, 2009 WL 250031 (D.S.C. Feb. 3, 2009)(remanding case to the ALJ "to articulate his assessment of the new and material evidence presented by [the plaintiff] so that this court may determine whether the ALJ's decision is supported by substantial evidence). As acknowledged by the Commissioner (Brief at 16), the court must determine whether the final decision of the Commissioner is supported by substantial evidence. Since the Appeals Council denied Plaintiff's request for review, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981; see Sims v. Apfel, 530 U.S. 103, 106-07 (2000). The court must "review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [Commissioner's] findings." Wilkins, 953 F.2d at 96.

As discussed above, the additional evidence from Dr. West appears to address several reasons why the ALJ discounted Dr. West's opinion. Based on the record before the undersigned, it is impossible to determine whether the ALJ's (and the Commissioner's) decision is supported by substantial evidence, since there is a reasonable possibility that the new evidence would change the

ALJ's decision. The evaluation of this additional evidence may affect the ALJ's determination as to Dr. Trouche's opinion which references findings by Dr. West.

Plaintiff argues that this action should be reversed with an award of benefits because the evidence is fully developed, she has shown that she has been disabled since March 8, 2005, there is a trend in the Charleston Office of Hearings and Appeals to deny cases a second time, and the SSA has unprecedented backlogs. The Commissioner contends that if the Court finds that the ALJ erred, remand for further proceedings is the appropriate remedy because the general rule is that a court of appeals should remand a case to an agency for decision, nothing warrants a departure from the general rule, a reviewing court should only enter a finding of disability if evidence overwhelmingly supports such a finding, and the record as a whole here does not compel a finding of disability.

Where the [Commissioner's] determination is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the case for a rehearing' " pursuant to Section 405(g). Vitek v. Finch, 438 F.2d 1157, 1158 (4th Cir.1971). An award of benefits is more appropriate when further proceedings would not serve any useful purpose. See Coffman v. Bowen, 829 F.2d 514, 519 (4th Cir.1987); Kornock v. Harris, 648 F.2d 525, 527 (9th Cir.1985). In addition, an award of benefits is appropriate when substantial evidence on the record as a whole indicates that the clamant is disabled, and the weight of the evidence indicates that a remand would only delay the receipt of benefits while serving no useful purpose. Parsons v. Heckler, 739 F.2d 1334, 1341 (8th Cir.1984); Tennant v. Schweiker, 682 F.2d 707, 710 (8th Cir.1982) Also, reversal is appropriate when the Commissioner has had an opportunity to develop the record on an outcome-determinative issue and has failed to produce substantial evidence, Broadbent v. Harris, 698 F.2d 407, 414 (10th Cir.1983),

Tennant, 682 F.2d at 710-711; or where "there is not the slightest uncertainty as to the outcome" and the remand "would be an idle and useless formality." NLRB v. Wyman-Gordon Company, 394 U.S. 759, 766 n. 6 (1969); Barry v. Bowen, 862 F.2d 869 (4th Cir. 1988)[Table]. On the other hand, remand is appropriate "where additional administrative proceedings could remedy defects...." Rodriguez v. Bowen, 876 F.2d 759, 763 (9th Cir. 1989).

Here, there are questions as to whether a finding of disability is warranted and the record does not overwhelmingly support a finding of disability. Thus, it is recommended that this action be remanded for further proceedings. See Woody v. Astrue, 2009 WL 799657, *29 (W.D.Va. March 24, 2009)(unpublished)(reluctantly remanding case to Commission for further consideration, even though the case had been pending for more than eight years and had been remanded twice, because "without further consideration of [the claimant's] physical and mental limitations, the court is not confident that a finding of disability is warranted"); Timmerman v. Commissioner of Social Security, 2009 WL 500604 (D.S.C. Feb. 26, 2009)(unpublished)(finding that remand for further proceedings was appropriate because deference to the agency's determination cautioned in favor of remand, the claimant's own court submissions asked that the case be remanded for consideration of her physicians' opinions, and evidence in the record did not overwhelming support a finding of disability).

## CONCLUSION

It is unclear from the record before the undersigned whether the Commissioner's decision is supported by substantial evidence. It is, therefore,

RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

August 25, 2010
Columbia, South Carolina